UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    *Plaintiff*,

vs.                                                            Case No. 18-cr-95-jdp

MATTHEW SLAUGHTER,

    *Defendant*.

---

**SENTENCING MEMORANDUM**

A person who has been raped in prison shouldn't have to go back there.

Reincarcerating prison-rape victims, like Matthew Slaughter, undermines sentencing's goals. Each of them. An aversion to this conclusion is understandable, but it's not well-founded. Unfortunately, Section 3553(a) isn't the only law that governs this Court's sentencing determination. In Slaughter's case it collides with other federal statutes. To accommodate all the governing laws, the Court must impose the third-best sentence that Section 3553(a)'s application alone calls for. Here's why and what that is.

    **1.    Reincarcerating a defendant, like Slaughter, who has been raped in prison defeats the goals of sentencing.**

Slaughter shouldn't be sentenced to any prison time because he's a prison-rape victim. (*See* Presentence Report, ¶ 94.) At least under the goals of sentencing embodied in Section 3553(a), he shouldn't spend a single day in a federal prison.

Let it be clear: this isn't a balancing argument. Reincarcerating a prison-rape victim like Slaughter defeats the goals of sentencing—each of them. A federal prison term undermines retribution, makes the public less safe, doesn't contribute to deterrence, and thwarts rehabilitation. Individually and collectively, Section 3553(a)'s sentencing goals' application here show that reincarceration is the disease—not the cure.

### a. Reincarcerating Slaughter undermines retribution because it would be unjustly severe.

Returning a prison-rape victim like Slaughter to the prison environment over-punishes him because he's at greater risk of being raped again and his subjective experience of any prison time would cause misery well beyond what law justly may impose. The combined punitive impact is unmoored from just retribution.

Congress acknowledged prison rape's terrible and varied ramifications when it passed the Prison Rape Elimination Act in 2003. *See* Pub. L. 108-79, § 2. Its findings confirmed what the criminal justice system's stakeholders already knew from experience. Neither the public nor government officials adequately appreciate prison rape's "epidemic character" and "the day-to-day horror experienced by victimized inmates." 34 U.S.C. § 30301(12). This is in part because the phenomenon is self-concealing. "Prison rape often goes unreported, and inmate victims often receive inadequate treatment for the severe physical and psychological effects of sexual assault—if they receive treatment at all." *Id.*,

§ 30301(6). Prison-rape victims contract, and die from, sexually transmitted diseases like HIV and hepatitis at rates far higher than the population generally. 34 U.S.C. § 30301(7). Prison-rape is associated with substantial increases in "post-traumatic stress disorder, depression, [and] suicide" as well as with "the exacerbation of existing mental illnesses among current and former inmates." *Id.*, § 30301(14)(D).

Prison rape is also self-perpetuating because victimization precipitates revictimization. For starters, among the greatest predictors of sexual victimization in prison is having suffered through a prior prison rape. *See* Robert W. Dumond, "The Impact of Prisoner Sexual Violence: Challenges of Implementing Public Law 108-79—The Prison Rape Elimination Act of 2003," 32 J. Legis. 142, 156 (2006) (collecting research). Indeed, "persons who have been sexually abused in the past have a greater chance of being preyed upon again in prison." Tasha Hill, "Sexual Abuse in California Prisons: How the California Rape Shield Fails the Most Vulnerable Populations," 21 UCLA Women's L.J. 89, 119 (2014) (collecting studies). Finally, prison rape's negative health effects include mental illness, and "[i]nmates with mental illness are at increased risk of sexual victimization." 34 U.S.C. § 30301(3).

Exposing a prison-rape victim like Slaughter to an objectively greater risk of being raped again is not part of any just punishment because no one deserves to be sexually-victimized. No doubt risks aren't certainties. But even one

additional sexual assault would be an unjustly severe punishment for Slaughter's offense conduct. *Cf. United States v. Gonzalez*, 945 F.2d 525, 529 (2d. Cir. 1991) (Winter, J., dissenting) ("If Gonzalez is assaulted on numerous occasions during his 33-month sentence, then his sentence will have been inhumanely long."). But even discounting for the chance that he'll be safe, reincarceration is unacceptably harsh.

It's also unacceptably harsh because it causes suffering totally unlike the typical inmate's. Continued incarceration of a prison-rape victim is associated with experiencing "on-going psychological trauma, terror, [and] helplessness." Dumond at 156. And "victimization in confinement may recall past experience and replicate prior traumas, exacerbating negative outcomes." National Prison Rape Elimination Commission Report, 153 (June 2009).

Prison, like any community, takes on a different cast if you've been raped there. Slaughter's time in prison will be harder than it is for the typical inmate because he doesn't just fear sexual violence. He doesn't have the luxury of denial. He knows its horror. He knows it murders the spirit. He knows what it's like to spend sleepless weeks wondering if he's contracted hepatitis or HIV.

These brute facts pose a retribution problem. Imagine a defendant identical to Slaughter in every way but who is not a prison-rape victim. The same prison term for both Slaughter and the imagined defendant would not be equally harsh because their experiences of incarceration would be totally different. And the

difference isn't justified: that Slaughter is a prison-rape victim doesn't mean his offense conduct should be punished more severely than if he were not. *See* Adam J. Kolber, "The Subjective Experience of Punishment," 109 Colum. L. Rev. 182, 189 (2009) ("[P]unishments vary in their severity based on the subjective experience of even those punishments that appear identical to the casual observer."). This isn't law-professor nonsense.

> Accordingly, insofar as the incarceration of a particular offender imposes terms and conditions that expand the reach of consequences ordinarily associated with confinement substantially beyond the zone of what is to be reasonably foreseeable and to be expected, in the typical case, the corresponding sentence is likely to work excessive hardships and exact a toll of suffering "of a kind, or to a degree" that, if not otherwise mitigated, would inflict upon the particular individual a magnitude of punishment effectively disproportionate to that meted out to offenders in the ordinary case. To that extent, that penalty may exceed what is necessary to serve the prescribed purposes of sentencing.

*United States v. Mateo*, 299 F. Supp. 2d. 201, 210-11 (S.D.N.Y. 2004) (quotations and citations omitted).

To be sure, this problem may be woven into the law. The criminal law itself is somewhat to blame for this problem because "our sentencing provisions pay fetishistic attention to the duration of terms of incarceration while largely ignoring the many other ways that prison sentences vary." Kolber at 188. But this doesn't mean that retribution's application must account for all of a defendant's peculiarities and sensitivities because "occasional shoves and knocks arising from

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC

5

necessary disciplinary encounters may fall within the realm of the warranted physical contacts an inmate may expect to suffer at the hands of prison guards." *See Mateo*, 299 F. Supp. 2d. at 211. And whatever warranted physical contacts are in that realm, "a rape is not" among them. *See id.*

> **b.** **Reincarcerating Slaughter doesn't protect the public; it makes the public less safe.**

Retribution doesn't justify Slaughter's reincarceration. The knee-jerk reaction to this conclusion is that he should be locked up in federal prison because his sentence's most pressing driver is protecting the public. After all, he's a recidivist. And a prison term is the only method for keeping the public safe.

Not so. The problem is that reincarcerating Slaughter makes the public less safe because it doesn't protect the public from further crimes—his specifically or in general. Incapacitating him in prison is an especially dangerous response because it doesn't provide actual safety—just its illusion.

Congress recognized the public safety risk that prison-rape victims pose. "Prison rape endangers the public safety by making brutalized inmates more likely to commit crimes when they are released—as 600,000 inmates are each year." 34 U.S.C. § 30301(8). Indeed, it creates safety risks even before the victim's release because victims may seek revenge inside, thus increasing "the level of homicides and other violence against inmates and staff, and the risk of insurrections and riots." *Id.*, § 30301(10).

Congress's concern for victim-inmates, other inmates, and prison staff is a reminder that incapacitation that just redistributes crime doesn't genuinely advance public protection. Redistribution isn't elimination because "it merely shifts the locus of crime from one side of the prison wall to the other." Markus Dirk Dubber, "Recidivist Statutes As Arational Punishment," 43 Buff. L. Rev. 689, 709 (1995). And this point isn't just an abstract one. "Precisely the crimes from which defendants are to be incapacitated by the current laws, namely violent crimes, are also the crimes that inmates can and do commit in prison-unlike, say, insider trading." *Id.*

Put another way, incapacitation that just redistributes crime only protects the public to the extent that inmates, not to mention the staff our taxes pay to mind them, don't matter. It reinforces the notion that inmates "are scum entitled to nothing better than what a vengeful populace and a resource-starved penal system choose to give them." *Johnson v. Phelan*, 69 F.3d 144, 152 (7th Cir. 1995) (Posner, J., dissenting). That notion "exaggerate[s] the distance between 'us,' the lawful ones, the respectable ones, and the prison and jail population." *Id.* And exaggerating this distance makes it easier for society "to deny that population the rudiments of human consideration." *Id.* Which, in turn, makes us all less safe. *See* 34 U.S.C. § 30301(8).

### c. Reincarcerating Slaughter imposes unnecessary misery because he's already as deterred as the law allows.

Retribution and public protection may not justify reincarcerating Slaughter. But there has to be some unpleasant consequence for his offense conduct. And without a federal prison term he'll have no incentive to comply with the law when he's released. No prison term, no specific deterrence.

There's surface-appeal to this view but it's wrong. Slaughter's conviction here already triggers profound incentives to comply with the law. Another offense could trigger a mandatory life prison term. *See* 18 U.S.C. § 3559(e) ("A person who is convicted of a Federal sex offense in which a minor is the victim shall be sentenced to life in prison if the person has a prior sex conviction in which the minor was the victim, unless the sentence of death is imposed."). Even if he doesn't reoffend, civil commitment looms for recidivists like him who are found to be "sexually violent" persons. *See* Wis. Stat. § 980.02(2). With the exception of the threat of death, the law already has imposed on him the strongest incentive to comply. Recalling a federal prison term's misery won't strengthen that incentive.

### d. Reincarcerating Slaughter does not advance general deterrence because it erodes respect for the law.

Reincarcerating Slaughter would seem to provide general deterrence. At a minimum, if he isn't punished with a federal prison term, then his sentence sends an ambiguous message to sex offenders about the consequences of recidivating. And this is the sort of message that must be unambiguous.

There's surface-appeal to this point too. It's fair to assume that the risk of being sexually assaulted in prison is among the reasons a rational actor would include in a determination of whether to commit a crime. And a sentencing court that reincarcerates a prison-rape victim, for whom the victimization-risk is especially high, underscores to the potential offender that the criminal justice system doesn't prioritize inmate safety. It sharpens the threat. Therefore, reincarcerating a prison-rape victim like Slaughter sends a vivid deterrent-message to potential offenders.

Whatever deterrent effect this vivid message generates is overwhelmed by the erosion of respect for the law because it stinks of hypocrisy. If rape is intrinsically wrong, then the criminal law should aim to prevent its occurrence anywhere and to anyone. When the criminal justice system expresses indifference to any category of victims, respect for the law erodes. Specific to the prison-rape context, indifference to "this brutal treatment" of inmates sends the message that "human life lacks intrinsic value; that the strong can have their way by preying on the weak; and that the concern of the human community extends only to those who never transgress its laws." Mary Sigler, "Just Deserts, Prison Rape, and the Pleasing Fiction of Guideline Sentencing," 38 Ariz. St. L. J. 561, 579 (2006).

Slaughter's suffering's federal prison's misery isn't justified because it would erode, not promote, respect for the law.

e.  **Reincarcerating a prison-rape victim like Slaughter is barrier to, not an avenue for, rehabilitation.**

If any of the above sections is persuasive, then the rehabilitation point doesn't need much explanation. Whatever Slaughter's educational, vocational, medical, or correctional needs as a prison-rape victim, reincarceration won't advance any of them. His subjective misery, coupled with his heightened revictimization-risk, make it fair to conclude that rehabilitation isn't an achievable goal.

2.  **Counter-arguments are unpersuasive.**

There's an undeniable aversion to the conclusion that reincarcerating a prison-rape victim who recidivates is wrong under any and all of sentencing's goals. But attempts to justify this aversion don't succeed.

a.  **Slaughter isn't lying.**

This seems like a drastic conclusion to base on Slaughter's self-reported victimization. After all, if he's lying, then the whole argument collapses. It's imprudent to have so much turn on his credibility.

The concern has an easy solution. The Court can examine Slaughter under oath at his sentencing hearing. The exercise is a routine one for it: it decides high-stakes issues based on credibility assessments all the time.

### b. Accounting for Slaughter's victimization won't inundate the Court with opportunistic fabulists.

Courts are justifiably reluctant to make rulings that encourage false claims. Here, the danger appears to be that countenancing anything in Section 1 would just create a foothold for opportunistic fabulists to exploit reasoning that doesn't apply to them. The Court doesn't want to turn every sentencing hearing involving a recidivist into a determination about whether the recidivist was raped during a prior incarceration term. It invites a distracting burden.

Not so. For starters, the risk that accounting for Slaughter's victimization will turn an under-reported phenomenon into an over-reported, meaning falsely-reported, crime doesn't seem likely. Plus, assessing a defendant's credibility is a routine part of any sentencing determination.[1] And in the prison-rape context, it's neither distracting nor an unjustified burden. Rather, it's an especially useful determination for the sentencing analysis generally. If the Court's believes the defendant, that's very valuable information. If the Court believes the defendant made it up to cheat the system, that too is very valuable information.

### c. Inmates bear the burdens of the criminal law's blunt imperfections, but prison rape and its effects shouldn't be among them.

Slaughter's criminal conduct is horrible. It would have gotten worse if he hadn't been detected when he was. The law must hold him accountable for his vile

---

[1] Slaughter's letter to the Court is attached as Exhibit A.

choices, and punishment without prison time might as well be no punishment at all.

This claim misses the mark. First, confinement in something other than prison, under onerous conditions, is still exceedingly unpleasant. This is just one example of the many tools the criminal justice system has to exact retribution. To suggest that the system is powerless to punish a prison-rape victim if it can't reincarcerate him for recidivating just isn't true. Second, between a sentence that over-punishes and one that under-punishes, Section 3553(a) makes the Court's choice clear: if it's greater than necessary to achieve sentencing's goals, then the Court shouldn't impose it.

### d.  Slaughter's rape, and its effects, shouldn't be minimized.

There's also an urge to roll one's eyes. It's not as if Slaughter was beaten into submission, gang-raped, and left for dead, bleeding and unconscious. He was coerced into it because he had gambling debts he couldn't repay. And he compared prison to an all boys' camp. (*See* PSR, ¶ 94.) He reports positive experiences in prison and made "the best of his situation." (*See id.*) He doesn't seem to be vulnerable to revictimization or especially traumatized by the sexual assault.

Leave to the side for the moment how problematic it is to minimize the harm Slaughter suffered and to suggest that he's partly responsible for being violated. If the Court suspects that his rape in prison wasn't that bad and that he's

fine now, he can testify about it at his sentencing hearing. His victimization's past and enduring misery will be apparent immediately.

### 3. Statutory constraints compel the Court to impose a sentence that is the third-best option — and a distant third-best at that.

Under the goals of sentencing embodied in Section 3553(a), reincarcerating Slaughter is a non-starter. A federal prison term would make things worse, not better.

The problem is that Section 3553(a) isn't the only statute in play. If it were, then confinement other than in federal prison would be the sentence the Court should impose. If it were empowered to do so, the Court should sentence Slaughter to time in a federal prison camp, or to a community corrections facility, where violence of any kind is essentially unheard of. Furthermore, these alternatives' less draconian features are much less likely to trigger the horror, fear, and misery that a prison environment will. But the Court isn't empowered to tell the Bureau of Prison how he should be confined. If it designates him to a medium-security prison or a high-security penitentiary, the Court can't do anything about it. Congress hasn't given the federal courts that authority.

Given this barrier, the second-best option would entail sentencing Slaughter to no additional federal prison time after he extinguishes his state revocation sentence. If the Court can't order the BOP to confine him at a camp, then the answer would seem to be not to put him in BOP custody at all. It could achieve this by running his federal sentence concurrently with his state revocation

sentence such that his state and federal terms expire on the same day in April 2025. (*See* PSR, ¶ 1.)

This second-best option isn't possible either because Congress forbids it. Under 18 U.S.C. § 2252, the Court must sentence Slaughter to at least ten-years' imprisonment. Even a concurrent minimum term would put him in federal prison for a year after he finishes his revocation sentence in 2025.

The third-best option isn't principled, but it satisfies the statutes the Court must follow. Because a federal prison term thwarts the goals of sentencing, the Court should minimize the damage and sentence Slaughter to the shortest federal prison term it can. The Court can't advance sentencing's goals here, but it can limit how badly its sentence undermines them.

The Court therefore should sentence Slaughter to the 10-year minimum prison term, running from his arrest date in November 2016.

Dated at Madison, Wisconsin, this July 16th, 2019.

Respectfully submitted,

*/s/ Peter R. Moyers*
Peter R. Moyers
Counsel for Matthew Slaughter

FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
peter_moyers@fd.org